IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2024

**STATE OF TENNESSEE v. HUNTER LOWERY**

**Appeal from the Circuit Court for Dyer County**
**No. 21-CR-244      Mark L. Hayes, Judge**
_____

**No. W2023-00415-CCA-R3-CD**
_____

Hunter Lowery, Defendant, entered an open plea of guilty to aggravated assault, and following a sentencing hearing, the trial court imposed an eight-year sentence to be served in confinement. Defendant claims that the trial court abused its discretion when it denied his request for alternative sentencing without placing sufficient findings on the record. Following a *de novo* review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Raven Prean-Morris, Assistant Public Defender, Tennessee District Public Defenders Conference (on appeal), and Sean Day, District Public Defender (at plea and sentencing), for the appellant, Hunter Lowery.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 11, 2021, the Dyer County Grand Jury returned a six-count indictment charging Defendant with attempted first degree murder (Count 1), especially aggravated kidnapping accomplished with a deadly weapon (Count 2), especially aggravated kidnapping causing the victim to suffer serious bodily injury (Count 3), aggravated assault causing the victim to suffer serious bodily injury (Count 4), aggravated assault causing serious bodily injury by use of a deadly weapon (Count 5), and violation of an order of protection (Count 6).

## *Plea Submission Hearing*

On November 17, 2022, Defendant entered an open plea of guilty to aggravated assault in Count 5 in exchange for an agreement that he would be sentenced as a Range II offender, that the length of the sentence and the manner of service would be determined by the trial court, and that the remaining counts would be dismissed. The State offered the following factual basis for the conviction at the plea submission hearing:

> If we had gone to trial, . . . the proof would be that on June 28th, which is the day after the event, Investigator Caldwell received a phone call from Witness Asia Thompson who was the roommate and friend of the victim, Kayla Dew, about Ms. Dew being assaulted by [Defendant]. Ms. Dew did not go to the hospital right away even though she did have serious injuries, because she had some warrants that were pending and her testimony would be, at trial, that she wanted to avoid arrest and she . . . was still afraid of [Defendant] because he was out.

> On July 1[, Defendant] was arrested on a different warrant, a Failure to Appear. They notified Ms. Dew through Ms. Thompson that [Defendant had] been arrested, so she did go to the hospital. Officers met her in Jackson at the hospital where they took photographs of her. There were several photos of her arms and legs. [A]ccording to the medical records, she had some pretty serious deep bruising to the leg area and a lot of swelling. Her arm was broken in two to three places, and she was never able to get surgery on that, so she still has, I guess, healed injuries at this point.

> According to Ms. Dew, [Defendant], who—[t]here's never been a domestic relationship between the two. They have always been, as she says, good friends. She considered him one of her best friends. He came over to visit. It was just the two of them at the time. And at some point, I don't think she ever really knew why, he became angry, picked up what was—they call it a homemade bat. It's a small wooden oak bat that somebody had made—and began striking her with it. This went on for a few hours according to Ms. Dew. She tried to leave and was not able to. Ms. Thompson . . . came by, noticed that something was wrong, was afraid to intervene so she leaves and calls for help. Eventually, a male friend, Jeff Reece, comes to the house, talks [Defendant] into coming out of the house. He takes him to Love's Truck Stop, drops him off.

And, the proof would be from these witnesses, well, from Ms. Dew and Mr. Reece, that [Defendant] made several disturbing statements about "I should have killed her, and I would have killed her if you hadn't come" to Mr. Reece. And, that would be mainly our proof, Your Honor, had we gone to trial.

The State explained that Defendant was pleading guilty to "Class C felony aggravated assault based upon the deadly weapon, the baseball bat," and the range of punishment was six to ten years at 35% service. The State noted that Defendant was entitled to 504 days' jail credit. After the trial court confirmed that the factual basis presented by the State was essentially correct and that Defendant understood his constitutional rights and was entering his plea knowingly and voluntarily, the court found Defendant guilty and set a date for a sentencing hearing.

### *Sentencing Hearing*

The State introduced the Presentence Report as Exhibit 1. Following opening statements, the State called Ms. Dew. Ms. Dew described Defendant as a "friend" and said that Defendant had been staying with Ms. Thompson and her "quite a bit" since Defendant was released from prison in December 2020. She said that, on June 26, 2021, the night of the assault, she was at her house when Defendant "just showed up." Around 6:30 p.m., Defendant began turning on and off the kitchen light. Ms. Dew was in an adjacent room, and when she told him to "quit turning on and off the light," Defendant came out of the kitchen holding a wooden bat and hit her with the bat. She said that Defendant told her that he had "already spared [her] once." She said that Defendant continued to assault her over the next three and a half hours, striking her with the bat in her leg several times. Ms. Dew said that Defendant kept telling her to repeat what he said, and when she did, he would tell her to "shut up." When Ms. Thompson arrived at the house, Defendant made Ms. Dew "stand in one spot in the kitchen" while Defendant went to the door to speak to Ms. Thompson. Ms. Dew hid the bat while Defendant was out of the kitchen talking to Ms. Thompson. After Ms. Thompson left, Defendant came back into the kitchen. Ms. Dew said that Defendant became "really mad" because she had hidden the bat and that, when Defendant found the bat, he hit her so hard that he broke her arm. According to Ms. Dew, Ms. Thompson "could tell something was wrong" because Ms. Thompson called Jeff Reece after talking to Defendant. Mr. Reece came to the house and talked Defendant into leaving. She said the assault continued until around 10:00 p.m. She could not telephone for help because Defendant had broken her cell phone.

Ms. Dew testified that Defendant broke her left arm "in three places." She said that the bones in her wrist and hand "were shattered" and that her hand was in a "frozen position permanently." She said that she needed, but could not afford, surgery. Ms. Dew's medical records and photographs of Ms. Dew at the hospital showing bruising "all up and down" her legs were admitted without objection. Ms. Dew testified that she could not walk for a month after the assault and that she still had pain and numbness in her leg. Ms. Dew said that she suffers from PTSD as a result of the assault and that she is currently receiving treatment for drug addiction. Ms. Dew explained that she did not go to the hospital for several days after the assault because she had an outstanding arrest warrant.

Defendant contacted Ms. Dew by cell phone while he was incarcerated and told her that he loved her and that he was sorry. Ms. Dew was incarcerated in the Dyer County Jail on drug charges during part of the time Defendant was incarcerated. She said that, when Defendant would see her, he would "flip her off."

On cross-examination, Ms. Dew agreed that Defendant "is not all there mentally[.]" She believed he had schizophrenia. She said that, when Defendant was not on drugs, "he's a great person." She said she wanted Defendant to have treatment for both his mental health and his drug addiction.

Dyer County Sheriff's Department Sergeant Jake Flora testified that he primarily works as a patrol officer but that, occasionally, he would be called in to help the correction officers at the Dyer County Jail when there was a problem. Sergeant Flora said that he had personally been involved in two separate incidents involving Defendant at the jail. On July 30, 2021, Sergeant Flora was called to assist with an incident that occurred while Defendant and one other inmate were being kept in "Max Security Cell 240." A sprinkler head was damaged, causing the cell to flood. Sergeant Flora said he was called to the jail on May 31, 2022, to search Defendant's cell after an incident occurred in "F-Pod." He discovered a cell phone and several "shanks" hidden in Defendant's mattress. He described a shank as a homemade knife. On cross-examination, Sergeant Flora agreed that he did not know whether Defendant or the other inmate damaged the sprinkler.

Carrie Vaughn, Defendant's mother, testified that Defendant was an excellent student, but she suspected that he started using drugs during the tenth or eleventh grade and that he became "a little more defiant." She said Defendant had an incident as a juvenile in which he and a friend were charged with spotlighting deer. She said that Defendant had previously attended two rehabilitation programs for substance abuse but that he had never been diagnosed with "a mental health problem." She asked the court to order Defendant to go to a "long-term health rehabilitation center." She said that Defendant could stay with her but that there were no drugs allowed in her home because she had "teenage kids." She said that, if Defendant lived with her, she would require Defendant to get a job and be

- 4 -

productive. She said that Defendant had never been violent toward her or his siblings and had always been respectful. She described Defendant as a "great brother" to his siblings.

Beth Crawford testified that she worked as a criminal justice liaison with courts, jails, and other facilities. Ms. Crawford said she had a bachelor's degree in psychology and had recently completed "a master's level in clinical mental health services." She said that she was currently working under a temporary license until she "accrued a certain number of hours" to be licensed. She said that, when she receives a referral concerning an individual needing help, she meets with the person, completes an assessment, and makes a recommendation for mental health and/or substance abuse services. Ms. Crawford received a referral from Defendant's counsel and met twice with Defendant to discuss his substance abuse and treatment history. She recommended that the court order Defendant to attend a six-month program at The Lighthouse, a facility that provides "psychiatric medication management therapy … along with substance-use treatment." Ms. Crawford presented an acceptance letter from The Lighthouse stating they could accept Defendant the following day if the court approved. On cross-examination, Ms. Crawford said The Lighthouse was aware of Defendant's criminal history because he had been there previously for treatment.

Defendant began his allocution by apologizing to the people that he had "hurt physically, emotionally, and financially." He claimed that, at the time of the assault, he had been "injecting meth for six months straight and [had been] without sleep for five days at a time." He said he "would never in a million years" hurt people "if he was in his right mindset." He said he was sorry for putting his "selfish desires" for drugs before his "children, parents, and other family members." He said that he "no longer wanted to live that way" and was "more than willing to fix" his drug problem.

The Presentence Report showed that the Defendant graduated from Dyersburg High School in 2013. He began using marijuana when he was fourteen and first consumed alcohol when he was fifteen. Defendant enlisted in the army in 2013, but negotiated a "general under honorable conditions discharge" in May 2014 after going "AWOL." Defendant reported that he successfully completed substance abuse treatment for methamphetamine at the Memphis Recovery Center in 2015 and that he successfully completed six-month inpatient treatment for methamphetamine abuse at Safe Harbor in Clarksville in 2016. Defendant said that he had twin seven-year-old daughters.

The Presentence Report ("PSI Report") showed that Defendant had prior convictions for a 2012 aggravated burglary and theft of property valued at more than $1,000 but less than $10,000, for which he was sentenced to four years' probation in 2015. His probation was partially revoked in 2016, and he was ordered to serve six months in jail. Defendant's probation was fully revoked on September 25, 2018, and he was sent to

prison on March 6, 2019. He was released from prison on October 11, 2020, after completing his sentence. He was also convicted of felony theft in December 2014, for which he was sentenced to one year and six months. In addition to the three prior felony convictions, Defendant had nineteen misdemeanor convictions between June 2014, and June 2021, including convictions for five assaults, five failures to appear, and one resisting arrest. The Tennessee Department of Correction (TDOC) Strong-R PSI Report showed that Defendant's risk level was "high."

The State argued that Defendant had a long history of criminal conduct, including a history of violent crimes, and that confinement was necessary to protect society and to avoid depreciating the seriousness of the offense. The State also argued that measures less restrictive than confinement had frequently and unsuccessfully been tried for Defendant.

Defendant argued that the assault did not rise to the level of exceptional cruelty or cause severe injuries, noting that Ms. Dew did not even go to the hospital until a few days later. Defendant asked the court to find mitigating factor (13) applied because Defendant's family was willing to support and encourage his rehabilitation and to provide him with a place to live. Defendant suggested that the court sentence him to an "eight-year term," grant a furlough conditioned on successfully completing rehabilitation, and then determine if Defendant should be placed on probation for the balance of the sentence.

Near the conclusion of the sentencing hearing, the trial court discussed with counsel whether the court had the authority to impose a sentence of split confinement on Defendant, who had been in jail for over 500 days, and to furlough Defendant so that he could seek rehabilitation. The State argued that Defendant was not a good candidate for rehabilitation "because of his dangerous offenses, his problems in jail, [and] his attitude toward the victim[.]" Defendant argued that a furlough would provide Defendant a chance to receive treatment for the first time for his mental health problems. The trial court stated that it wanted to research whether it had the authority to continue to hold Defendant in jail and took the matter under advisement.

### Sentencing Findings and Sentence

On February 28, 2023, the trial court filed a document titled, "Sentencing Findings of Fact for Offenses Committed on or after June 7, 2005" ("the Sentencing Findings").[1] The Sentencing Findings had blanks before each of the twenty-nine enhancement factors listed in Tennessee Code Annotated section 40-35-114 (2022) and the thirteen mitigating

---

[1] The Sentencing Findings is a form designed to aid trial courts in sentencing. Among other things, the form lists the sentencing principles codified at Tennessee Code Annotated sections 40-35-102 and 40-35-103 and the factors used to determine the specific sentence and sentence alternatives codified at section 40-35-210(B) and states that the court had considered them.

factors listed in section 40-35-113 (2022). By placing a check mark in the blank, the court found that the following three enhancement factors applied:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

> (6) The personal injuries inflicted upon . . . the victim w[ere] particularly great, and

> (8) The defendant, before trial or sentencing, has failed to comply with the conditions of a sentence involving release in the community[.]

In the section listing the mitigating factors that the court found applicable, the court wrote "none."

The trial court sentenced Defendant as a Range II offender to eight years at 35% to be served in the Tennessee Department of Correction. The judgment of conviction was entered on March 21, 2023. On March 22, 2023, a notice of appeal was filed with the Appellate Clerk's Office.[2]

## Analysis

On appeal, Defendant claims that the "trial court abused its discretion when it denied [Defendant]'s request for alternative sentencing and imposed a term of confinement without placing sufficient findings on the record." Defendant asks this court to conduct a *de novo* review and grant Defendant's request for an alternative sentence or remand for the trial court to consider the requisite factors in determining whether to grant an alternative sentence. The State claims that the trial court properly denied Defendant's request for an alternative sentence.

---

[2] On June 13, 2023, Defendant filed a motion for modification of sentence pursuant to Tennessee Rule of Criminal Procedure 35. By order entered July 28, 2023, the trial court denied the Rule 35 motion. Defendant filed a notice of appeal from the denial of his Rule 35 motion, and the appeal was docketed under No. W2023-01080-CCA-R3-CD. This court ordered the Rule 35 appeal to be consolidated with the direct appeal, No. W2023-00415-CCA-R3-CD.

### *Standard of Review*

"[T]he abuse of discretion standard accompanied by a presumption of reasonableness applies to all sentencing decisions," including the denial of an alternative sentence, "when the trial court properly supports its decision on the record in accordance with the purposes and principles of sentencing." *State v. King*, 432 S.W.3d 316, 329 (Tenn. 2014); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). When the trial court fails to place on the record its reasons for denying an alternative sentence and imposing a sentence of confinement, we can either conduct a *de novo* review to determine whether there is an adequate basis for the sentence or remand for the trial court to consider the requisite factors. *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013).

### *Alternative Sentence*

"Any sentence that does not involve complete confinement is an alternative sentence." *State v. Dotson*, No. M2018-00657-CCA-R3-CD, 2019 WL 3763970, at *10 (Tenn. Crim. App. Aug. 9, 2019) (citing *State v. Fields*, 40 S.W.3d 435 (Tenn. 2001)). Alternative sentences include probation, periodic confinement, split confinement, community corrections, fine, and restitution. Tenn. Code Ann. § 40-35-104(c) (2022). Defendant was not a favorable candidate for alternative sentencing because he was being sentenced as a Range II multiple offender. *Id*. § 40-35-102(6)(A) (2022).

Defendant was eligible for probation because his sentence was ten years or less and because aggravated assault was not an offense made statutorily ineligible for probation. *Id*. § 40-35-303(a) (2022). Although eligible for probation, Defendant had the burden of establishing that he was suitable for probation and "demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

To determine "the specific sentence and the appropriate combination of sentencing alternatives," a trial court must consider the following:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The pre-sentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement that the defendant wishes to make on the Defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department [of correction] and contained in the presentence report.

Tenn. Code Ann. §§ 40-35-210(b)(1)-(7) (2022).[3]

Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

*Id*. § 40-35-103(1) (2022).

Additionally, the trial court should consider a defendant's "potential or lack of potential for the rehabilitation or treatment . . . in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2022)

---

[3] According to the Sentencing Findings, the trial court considered these factors in imposing the sentence.

Tennessee Code Annotated section 40-35-210(e)(1) provides that "[i]n order to ensure fair and consistent sentencing, at a sentencing hearing the court shall place on the record, either orally or in writing . . . [t]he reasons for the sentence[.]" For this court to properly review a sentence, the trial court must not only consider the purposes and principles of sentencing, but the court must articulate on the record its reasons for imposing the sentence. *See Caudle*, 388 S.W.3d at 278-79 (citing *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).

The trial court did not state, either orally or in writing, its reasons for denying an alternative sentence or upon which consideration or considerations specified in Tennessee Code Annotated section 40-35-103(1) (2022) it based its decision to deny Defendant an alternative sentence. Where the trial court fails to place on the record its reasons for denying an alternative sentence and imposing a sentence of confinement, we "should neither presume that denying [an alternative sentence] was reasonable nor defer to the trial court's exercise of its discretionary authority." *Pollard*, 432 S.W.3d at 864.

The only findings made by the trial court are those found in the Sentencing Findings. The court found that Defendant was a Range II offender; that enhancement factors (1), (6), and (8) applied; that no mitigating factors applied; and that consecutive sentencing factors were not applicable. Although there may be some overlap between the language of certain enhancement factors and the language of the sentencing principles applicable to sentences involving confinement codified at Tennessee Code Annotated section 40-35-103(1), the purposes of the two statutes are very different. Enhancement factors and mitigating factors are advisory only and may be used by the trial court to adjust "the sentencing length within the range." Tenn. Code Ann. § 40-35-210(c)(2) (2022). The principles in Tennessee Code Annotated section 40-35-103(1) are to be used by the trial court to determine whether a defendant should serve an alternative sentence or serve the sentence in confinement. Although the court found that Defendant had a "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range" (enhancement factor (1)), the court failed to find whether "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct." *Id.* § 40-35-103(1)(A) (2022). Although the court found that "the personal injuries inflicted upon . . . the victim w[ere] particularly great" (enhancement factor (6)), the court failed to find that "[c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses." *Id.* § 40-35-103(1)(B) (2022). Although the court found that Defendant "before trial or sentencing ha[d] failed to comply with a condition of a sentence involving release in the community" (enhancement factor (8)), the court failed to find that "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]" *Id.* § 40-35-103(1)(C) (2022).

Because the trial court failed to provide its reasons for denying an alternative sentence, the abuse of discretion standard, accompanied by a presumption of reasonableness, does not apply. *See Pollard*, 432 S.W.3d at 864. However, we determine that the record on appeal is adequate for this court to conduct a *de novo* review.

### *De Novo* Review

The PSI Report showed that Defendant had prior convictions for aggravated burglary and theft of property valued at more than $1,000 but less than $10,000, for which he was sentenced to four years' probation in 2015. Defendant was convicted of felony theft in December 2014, for which he was sentenced to one year and six months. In addition to the three prior felony convictions, Defendant was convicted of nineteen misdemeanor offenses between June 2014, and June 2021, including convictions for five assaults, five failures to appear, and one resisting arrest. Defendant's probation was partially revoked in 2016, and he was ordered to serve six months in jail. Defendant's probation was fully revoked on September 25, 2018, and he was sent to prison on March 6, 2019. He was released from prison on October 11, 2020, after completing his sentence. The TDOC Strong-R PSI Report showed that Defendant's risk level was "high."

The PSI Report also showed that Defendant had a long history of using illegal drugs. He began using marijuana when he was fourteen, first consumed alcohol when he was fifteen, and began using methamphetamine when he was nineteen. Defendant enlisted in the army in 2013, but he had to accepted a "general under honorable conditions discharge" in May 2014, after going "AWOL." Defendant reported that he successfully completed substance abuse treatment for methamphetamine in 2015 and again in 2016. Although Defendant testified that he successfully completed two rehabilitation programs, Defendant continued to use methamphetamine. According to Defendant, he had been injecting methamphetamine "for six months straight" and "had been without sleep for five days at a time" when he assaulted Ms. Dew on June 28, 2021, which would mean that Defendant began using methamphetamine shortly after he was released from prison on October 11, 2020. Although Defendant claimed that he "no longer wanted to live that way" and was "more than willing to fix" his drug problem, his past actions demonstrate otherwise.

Moreover, Defendant violently assaulted Ms. Dew with a deadly weapon, a wooden bat. The assault continued for three and a half hours. Defendant struck her so hard that it broke her left arm "in three places" and shattered bones in her wrist and hand leaving her hand in a "frozen position permanently." As a result of the blows to her legs, Ms. Dew was unable to walk for a month after the assault. Defendant had a history of violent conduct. The aggravated assault on Ms. Dew resulted in Defendant's sixth conviction for assault. During the assault, Defendant told Ms. Dew that he had "already spared [her] once." According to the factual basis provided at the guilty plea submission hearing,

Defendant told Mr. Reece that he "should have killed [Ms. Dew], and [he] would have killed her if [Mr. Reece] hadn't come."

Based on the evidence received at the plea submission hearing and sentencing hearing, we determine that Defendant committed a violent assault with a deadly weapon that caused serious and permanent bodily injury to Ms. Dew. The PSI Report shows that Defendant had an extensive criminal record, including five prior convictions for assault. Based on the nature and characteristics of Defendant's criminal conduct and criminal history, Defendant demonstrated "a clear disregard for the laws and morals of society." Tenn. Code Ann. § 40-35-102(5) (2022). Defendant had two prior violations of probation, each of which resulted in lengthy periods of incarceration. Two prior rehabilitation treatments did not end Defendant's illegal drug usage, thereby indicating that Defendant's potential for rehabilitation is low.

Based on the evidence received at the plea submission hearing and the sentencing hearing, including the PSI Report, we determine that Defendant has "a long history of criminal conduct" and that "[c]onfinement is necessary to protect society by restraining [D]efendant." *Id*. §40-35-103(1)(A). Based on the PSI Report, we also determine that "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to [D]efendant[.]" *Id*. §40-35-103(1)(C).

We do not mean to imply that a trial court cannot use a form, such as the Sentencing Findings used in this case, to aid the trial court in imposing a sentence. However, the trial court should do more than simply sign the form showing that it considered the purposes and principles of sentencing and other relevant considerations, especially when the form makes no findings of the relevant factors, as required when denying an alternative sentence or imposing a consecutive sentence. As previously noted, the court must place on the record, either orally or in writing, its reasons for imposing the sentence. *Id.* § 40-35-210(e)(1)(B) (2022).

### *Conclusion*

After a *de novo* review of the record, we determine that the trial court properly denied an alternative sentence, and we affirm the judgment of the trial court imposing a sentence of confinement.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 12 -